UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,                    :
                                             :
                        Plaintiff,           :        **MEMORANDUM AND ORDER**
                                             :
            - against -                       :        1:08-cr-00234-ENV-1
                                             :
ROHAN MARK PEARCE,                           :
                                             :
                        Defendant.           :
                                             :
-------------------------------------------------------------X

**VITALIANO, D.J.**

On April 9, 2008, defendant Rohan Mark Pearce was indicted for the crime of illegal

reentry into the United States subsequent to deportation for conviction of an aggravated felony.

Defendant moves for dismissal of the indictment with prejudice, pursuant to Federal Rule of

Criminal Procedure 12(b)(2), 8 U.S.C. § 1326(d) and the Fifth Amendment, on the ground that

the deportation order against him was invalid since it resulted from deportation proceedings that

were fundamentally unfair and which violated his constitutional right to due process. For the

reasons stated below, the Court denies defendant's motion to dismiss.


**I. FACTS**

Pearce was born in Jamaica on January 17, 1971. He is the seventh of eight siblings. On

June 9, 1988, he entered the United States as a lawful permanent resident and, a minor, took up

residence in the Bronx with his mother and several of his sisters, all of whom had emigrated

from Jamaica a few years earlier. Pearce briefly attended Roosevelt High School, but dropped

out in the tenth grade. In his late teens and early twenties, Pearce lived between the homes of his

1

mother and his girlfriend. Intermittently during this period, he held odd jobs such as electrician, custodian and carnival ride operator.

In 1994, Pearce was arrested on two separate occasions in Newburgh, New York. On October 11, 1994, he pleaded guilty in Orange County Court to two crimes in satisfaction of the charges arising from those arrests: attempted criminal possession of a controlled substance (cocaine) in the fourth degree (a Class C felony), and criminal sale of a controlled substance (cocaine) in the third degree (a Class B felony). He was sentenced to prison terms of, respectively, 1 ½ to 4 ½ years and 2 ½ to 8 years, to be served concurrently.

Shortly after Pearce was convicted and while he was incarcerated, the then-Immigration and Naturalization Service ("INS") commenced deportation proceedings on January 13, 1995, citing Pearce's conviction for selling cocaine and indicating that he was deportable as an aggravated felon and drug law violator, pursuant to §§ 241(a)(2)(A)(iii) and 241(a)(2)(B)(i) of the Immigration and Nationality Act of 1952 ("INA"), respectively. Pearce was directed to appear for a hearing before an Immigration Judge ("IJ").

Pearce's first deportation hearing was held on April 11, 1995, where he was not accompanied by a lawyer or any other kind of representative. At the outset, the IJ explained to him what his right to counsel entailed:

> Q. You have certain rights in these proceedings and I want to explain some of them to you. The first right is you have the right to have an attorney or representative. It should be somebody of your own choosing but at no cost to the Government. It's not like a criminal court where the judge can appoint a lawyer for you. I can't appoint anyone for you. If you're going to have a lawyer or representative you're going to have to obtain them on your own, through your own efforts of family and friends efforts. Do you understand?
> A. Sir, yes Sir.
> ...
> Q. Right there in front of you is a list of the free legal services. Why don't you take a copy. On page 2 you will see there is a list of the organizations that have agreed that they may represent people for little or no cost.

2

...

> Q. Now basically you have three alternatives regarding a lawyer. You can, if possible, you, your family, or friends could hire a private lawyer to represent you. If, however you can't do that you can perhaps find one of the organizations that would be willing to represent you. The third alternative is that if you can't find a lawyer or representative you can represent yourself. In fact you don't have to have a lawyer in these proceedings, it's not required. You can speak for yourself and you can represent yourself. Do you understand?
>
> A. Sir, yes sir.

Def. Ex. D. at 2-3. Pearce stated that his mother was trying to obtain a lawyer to represent him, and the IJ agreed to adjourn the hearing to allow an opportunity for counsel to be secured.

On May 23, 1995, after serving approximately seven months in state prison, Pearce was paroled and released into INS custody. At the next hearing in his deportation proceeding, held on June 9, 1995, Pearce advised the IJ that his family expected to hire a private attorney on his behalf within a few days, and the IJ agreed to adjourn once again. Prior to the next hearing, Pearce did secure representation by an attorney, Kerry Bretz, who accompanied him four days later on the adjourned date. After successfully moving to reduce bond from $15,000 to $5000, Bretz stated that he "need[ed] time to prepare" Pearce's case. Def. Ex. G. The following day, Pearce posted bond and was released.

Pearce's deportation proceedings continued on March 29, 1996, with Irwin Berowitz, an attorney from Kerry Bretz's firm, appearing on his behalf. Pearce conceded deportability at that hearing, but sought discretionary relief under INA § 212(c) (then codified at 8 U.S.C. § 1182(c)), a statutory provision permitting the Attorney General to waive deportation of an alien previously convicted of an aggregated felony.[1] Invocation of this exception (often referred to as a § 212(c)

---

[1] Although the law granting such discretion, on its face, applied only to aliens seeking to reenter the United States, courts had interpreted it as also applying to aliens seeking relief from deportation. See, e.g., Francis v. INS, 532 F.2d 268, 273 (2d Cir. 1976) (rationalizing that "[f]undamental fairness dictates that permanent residents who are in like circumstances, but for irrelevant and fortuitous factors, be treated in a like manner"); see also Drax v. Reno, 338 F.3d 98, 107-08 (2d Cir. 2003) (describing general availability of § 212(c) relief).

waiver) required the finder of fact to balance the "adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented in his behalf." See United States v. Perez, 330 F.3d 97, 102 (2d Cir. 2003); Lovell v. I.N.S., 52 F.3d 458, 461 (2d Cir. 1995). The IJ instructed Pearce to file an I-191 (the form application for a § 212(c) waiver) by May 17, 1996, and scheduled a hearing for June 27, 1996.

On April 24, 1996 – just a few weeks after Pearce was first told to file a § 212(c) application – the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") took effect. AEDPA amended 8 U.S.C. § 1182(c) to render aliens who had pleaded guilty to one or more aggravated felonies, regardless of length of residency in the United States, ineligible for § 212(c) relief. See AEDPA § 440(d).[2] When Pearce returned to immigration court on June 27, 1996 for his § 212(c) application to be heard, a question arose regarding whether AEDPA applied retroactively to aliens whose deportation proceedings were already in progress on the new law's effective date. The IJ adjourned again, this time to await a forthcoming decision by the Board of Immigration Appeals ("BIA") that was expected to resolve the issue.

That very same day, the BIA issued its opinion in In re Soriano, 21 I. & N. Dec. 516 (BIA June 27, 1996), holding – erroneously, as it turned out – that AEDPA indeed precluded any alien convicted of one or more aggravated felonies from obtaining a § 212(c) waiver, whether or not the alien was eligible for such relief when his deportation proceedings began.[3] Relying on

---

[2] On September 30, 1996, Congress again amended the INA via the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which took effect on April 1, 1997. IIRIRA repealed § 212(c) entirely and replaced it with a new section granting the Attorney General the discretion to cancel deportation only for a narrowly defined class of inadmissable or deportable aliens - a class which did not include persons "convicted of any aggravated felony." See IIRIRA § 304(b).

[3] In 1998, the Second Circuit found that § 212(c) relief remained available to aliens whose deportation proceedings were pending prior to AEDPA's change in the law. Henderson v. INS, 157 F.3d 106 (1998). In 2001, that view was embraced by the Supreme Court, which held that "§ 212(c) relief remains available for aliens . . . whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of their plea under the law then in effect." INS v. St. Cyr, 533 U.S. 289, 326, 121 S. Ct. 2271, 2293 (2001), aff'g, 229 F.3d 406 (2d Cir. 2000).

4

Soriano, on March 10, 1997, an IJ found Pearce to be categorically ineligible for a § 212(c) waiver and ordered him deported. Pearce remained out on bond, however, as he appealed the IJ's decision to the BIA.

On August 12, 1999, Pearce was arrested in South Carolina and charged with possession of less than 28 grams of marijuana. He pled guilty on September 21, 1999. See Gvt. Ex. 4. On June 11, 2000, Pearce was arrested again in the Bronx by the New York City Police Department and charged with several drug-related crimes. On May 2, 2001, in satisfaction of the charges arising from that arrest, Pearce pled guilty to one count of criminal possession of a controlled substance (cocaine) in the seventh degree (a Class A misdemeanor). He was sentenced to time served. It appears that Pearce never told his immigration counsel about the South Carolina conviction and provided counsel with an inaccurate description of the Bronx conviction months after the fact.[4]

On July 17, 2001, the BIA heard Pearce's appeal of his 1997 deportation order. In light of the Second Circuit's decision in Henderson, the BIA reopened his deportation proceedings so that he could re-apply for § 212(c) relief. On December 7, 2001, Berowitz, with Pearce present, appeared before an IJ, who scheduled a hearing on the application for May 16, 2002.

On March 13, 2002, the INS served both Pearce (through counsel) and the immigration court with notice that they would be relying upon evidence of Pearce's 2001 conviction in his deportation proceedings. See Gvt. Ex. 9. Another adjournment followed, due to a few procedural bumps noted by the IJ:

---

[4] According to notes maintained by Berowitz's firm, on February 20, 2002, Pearce provided Berowitz with a "certif. of disposition for 2001 arrest (DISMISSED AND SEALED)." Several months later, after the conviction became an issue in Pearce's deportation proceedings, the notes indicate that Pearce told Berowitz "it was not a conviction because after he pleaded guilty to a drug offense, the judge had him go to Daytop [a treatment program] for ninety days." Def. Post-H. Ex. E.

> [T]hrough oversight it was [previously] not made clear the consequences of the conviction that was apparent to exist on May 2, 2001. It appears that the respondent may in fact have been convicted on a plea of guilty of criminal sale of a controlled substance . . . . [Pearce's counsel] did not have the opportunity to review it, and in lieu of the potential dire consequences and circumstances that may flow from this conviction I'm going to ask the Government to obtain a certified record of conviction for this particular conviction and serve it on Mr. Berowitz before the next hearing on August 8, 2002.

Def. Ex. T.

In the interim, Berowitz submitted a letter brief opposing the government's position that Pearce's 2001 misdemeanor conviction precluded his eligibility for a § 212(c) waiver as a matter of law, arguing that IIRIRA § 309 "specifically provided that the repeal [of § 212(c)] would not be retroactively applied to affect those aliens who were the subject of previously commenced deportation or exclusion hearings." Def. Ex. U.

Nonetheless, on August 8, 2002, the IJ issued an oral decision finding that Pearce was ineligible for § 212(c) relief as a matter of law due to his 2001 misdemeanor conviction and ordered him to be deported to Jamaica. The IJ concluded that neither Henderson nor St. Cyr contemplated that § 212(c) relief would be available to persons convicted of crimes after April 24, 1996, and noted "respondent has no reasonable or settled expectation that a conviction after the enactment of the AEDPA or IIRIRA would be waived. To do so would work an injustice to the statute. It would give an alien in effect a blank check to waive all future convictions, even hypothetically, for crimes that hadn't even taken place yet." Def. Ex. W.

Berowitz reserved Pearce's right to appeal to the BIA, and after requesting and receiving an extension of time, Berowitz's associate, Ruchi Thaker, timely filed an appeal brief on March 4, 2003.[5] On December 12, 2003, the BIA summarily affirmed.

---

[5] The retainer agreement Pearce had signed and the fee he had paid to Bretz & Coven only covered representation before the immigration court. According to the firm's client file notes, on the date that the IJ rejected Pearce's § 212(c) application, Pearce "did not have the $$$ for filing fee N of Appeal," and told Berowitz he would "come

On New Year's Eve, Pearce met with Jules Coven,[6] a named partner at Berowitz's firm, to discuss his options – it was their first and only interaction. Coven testified at the hearing on this motion that he had no independent recollection of meeting with Pearce. He acknowledged, though, that he was not one of the attorneys who customarily oversaw Pearce's case. See 4/23/2009 Tr. at 37.

Coven testified further, however, that on many occasions he had had similar meetings with aliens who had lost a BIA appeal of a deportation order and that he had a regular custom and practice in such meetings to explain the alien's right to appeal the decision by filing a petition for habeas corpus in federal court, to quote a fee that the firm would charge for this service, to offer his opinion of the likelihood of success and to emphasize that, if no further legal action was taken, the alien would be deported and barred from reentering the United States. See id. at 31-32. Based on his review of Pearce's file and his knowledge of the relevant state of the law, Coven testified that at the time of their meeting he "was pretty sure we could win that appeal, the petition or the writ" and that he "had personally handled a few cases where the judges agreed with us." Id. at 38.

Importantly, following this December 31, 2003 meeting, Coven made a contemporaneous note in Pearce's file stating "alien in office. Advised him fee [for firm to file habeas petition] would be 10-15 thou. $7500 retainer." Def. Post-H. Ex. E. Coven also testified that he did not specifically recall whether Pearce reacted to the price quote. But Coven testified further that if Pearce had expressed to him that he was not going to proceed with the case because of the fee,

---

back here with it in next 10 days." Def. Post-H. Ex. E. Seventeen days later, Pearce did in fact return with the $110 filing fee, and Bretz & Coven proceeded with the BIA appeal. See id. However, Pearce never signed a retainer agreement or paid the firm for services rendered with regard to that step.

[6] As demonstrated by his testimony, Coven is an expert in the field of immigration law, including the litigation of deportation and removal proceedings. Coven has been a practicing attorney in this specialty area for approximately 50 years. See 4/23/2009 Tr. at 25-28.

Coven's practice would "of course" have been to note that fact in the file. Additionally, Coven went on to say that in quoting the "standard fee" to a firm client whom he had not personally represented or previously had contact (such as Pearce) and the client stated he would or could not pay that amount, Coven's practice was to tell the client to wait and see the partner they usually dealt with (here, Kerry Bretz), who "would have the authority to waive the fee, reduce the fee, go ahead and have a payment plan." 4/23/2009 Tr. at 37.

On the other hand, Coven also acknowledged that he did not specifically recall whether or not he explained to Pearce that he could, if he wished, file the habeas petition *pro se*. It was, he said, however, the firm's regular practice to inform clients who were unable to pay its fees that they could hire other, less expensive lawyers or proceed without counsel, and the firm would supply any client with their file upon request. Coven testified further as to his custom and practice, noting that when an appeal involved a substantial unsettled question of law, he believed it would be "bad advice" to tell a client to proceed *pro se*. As to Pearce's appeal specifically, Coven testified: "I probably would not have said [that he could proceed *pro se*] because I think it is – it was a substantial issue. If he had raised an issue that he really couldn't afford it, I think that is why I wanted him to see Mr. Bretz. On my recollection, this is the case that you just don't – you want him to see the person that saw him and see what can be done." Id. at 52-53. Pearce's account of the meeting is not materially different.[7]

Pearce never returned to Coven's firm after his New Year's Eve meeting, and no habeas petition was ever filed either. Pearce was deported on November 17, 2005. Pearce now

---

[7] "When I met with a lawyer at the Bretz law firm about the Board of Immigration Appeals' upholding the Immigration Judge's Order of Deportation, the lawyer told me that the firm would charge me a large sum to appeal the decision further. I cannot remember the sum precisely, but I believe it was at least $15,000, and I remember it was approximately or more than twice what I was earning per year. I did not have the amount and could not realistically hope to get it. The lawyer never told me that I could appeal the decision further on my own without the representation of a lawyer." Def. Ex. A.

complains, among other things, that his "immigration lawyer was ineffective in failing to inform him of his right to represent himself in challenging the BIA's decision." Def. 7/6/2009 Post-H. Mem. at 3-4.

On January 29, 2008, Pearce was arrested in Queens, New York on a local charge. A post-arrest review of his criminal history report revealed that Pearce had previously been deported. See Compl. at ¶¶ 2-5. Pearce was indicted on April 9, 2008 on one count of illegal reentry in violation of 8 U.S.C. § 1326(a) and (b)(2).

## II. DISCUSSION

### A. Collateral Attacks on Deportation Orders in Illegal Reentry Prosecutions

Title 8 U.S.C. § 1326(b)(2) makes it a crime for an alien who has been deported to enter, attempt to enter, or be found in the United States without the express consent of the Attorney General if the deportation "was subsequent to a conviction for commission of an aggravated felony." However, because a prior deportation is a necessary element of the crime of illegal reentry, the Supreme Court has held that an alien can defend against such a criminal charge by challenging the validity of the deportation order upon which the charge is predicated. See United States v. Mendoza-Lopez, 481 U.S. 828, 837-39, 107 S. Ct. 2148, 2154-2156 (1987). In 8 U.S.C. § 1326(d), Congress codified the collateral attack aspect of Mendoza-Lopez. In sum, then, an alien collaterally challenging a deportation order is required to demonstrate the following:

> (1) exhaustion of administrative remedies;
>
> (2) that the deportation proceedings improperly deprived the alien of the opportunity for judicial review; and
>
> (3) the entry of the order was fundamentally unfair.

A defendant charged with illegal reentry must establish all three prongs of 8 U.S.C. § 1326(d) to invalidate the predicate deportation order. United States v.Fernandez-Antonia, 278 F.3d 150, 157 (2d Cir. 2002).

### 1. First Prong – Exhaustion of Administrative Remedies

Pearce timely appealed the IJ's denial of § 212(c) relief to the BIA in 2002. The BIA subsequently affirmed the IJ's holding that Pearce was statutorily barred from seeking § 212(c) relief. Because a decision of the BIA is the final administrative determination in a case such as this, an appeal of an IJ's order to the BIA generally satisfies the administrative exhaustion requirement. See 8 C.F.R. § 242.21 (1996); Mejia-Ruiz v. INS, 51 F.3d 358, 364 (2d Cir. 1995); United States v. Cottone, 244 F. Supp. 2d 126 (E.D.N.Y. 2003). As a consequence, the government does not dispute that Pearce has satisfied the first prong.

### 2. Second Prong – Deprivation of Judicial Review

The second prong requires an alien to demonstrate a deprivation of the opportunity for judicial review of the order of deportation. Such judicial review, the Second Circuit has found, is not necessarily limited to direct appeal of the order but can also be had by habeas review under 28 U.S.C. § 2241.[8] See United States v. Copeland, 376 F.3d 61, 68-69 (2d Cir. 2004); United States v. Gonzalez-Roque, 301 F.3d 39, 49-50 (2d Cir. 2002). Critically, though, the mere "technical availability" of habeas relief will not suffice "where no realistic opportunity for judicial review by way of habeas review existed;" in that event, "an alien's failure to seek [habeas] review will not be deemed to preclude a collateral attack on a deportation order under Section 1326(d)(2)." Copeland at 68-69 (emphasis added).

---

[8] Notwithstanding IIRIRA's elimination of direct judicial appeal of deportation proceedings by aliens who (like Pearce) were convicted of aggravated felonies, see 8 U.S.C. § 1252(a)(2)(C), the path for judicial review by habeas petition remains open in this context.

The Second Circuit has focused on several key factors in its "realistic opportunity" analysis. Most obviously, judicial review is "deemed to have been denied where the interval between entry of the final deportation order and the physical deportation is too brief to afford a realistic possibility of filing a habeas petition." Id. at 68; see, e.g., United States v. Sosa, 387 F.3d 131, 138 (2d Cir. 2004) (one-month interval deemed insufficient for realistic possibility of judicial review); United States v. Calderon, 391 F.3d 370 (2d Cir. 2004) (six-week interval deemed insufficient); United States v. Gonzalez-Roque, 301 F.3d 39 (2d Cir. 2002) (ten-month interval deemed sufficient). Irrespective of practical time limitations, judicial review may have been realistically impossible "where the government affirmatively misle[d] an alien about the availability of relief." United States v. Lopez, 445 F.3d 90, 99 (2d Cir. 2006) (emphasis added). Additionally, "deprivation of the opportunity for judicial review can be established by demonstrating ineffective assistance of counsel." See Perez, 330 F.3d at 101.

Here, nearly two years elapsed between the BIA's final judgment affirming the IJ's order of deportation and Pearce's physical deportation to Jamaica. In the absence of unusual considerations, that length of time would likely be deemed more than adequate to permit an alien to pursue habeas review. However, Pearce argues that he was deprived of a realistic opportunity for judicial review on two separate, independent and unusual grounds: (1) the agency determination that his 2001 conviction foreclosed the availability of § 212(c) relief as a matter of law was an "egregious error," and (2) his lawyer failed to inform him that he could have challenged the deportation order on his own without paying a significant fee – stated differently, that he was denied the effective assistance of counsel.

As to the latter point, Pearce's claim that he received ineffective assistance of counsel in the aftermath of his deportation proceedings, and consequently was deprived of effective judicial

review, standing alone as a Sixth Amendment claim, is simply without merit. Given that deportation proceedings are civil in nature, the Sixth Amendment right to counsel is inapplicable. See Perez, 330 F.3d at 101. Thus, to prevail on an ineffective assistance of counsel claim, an alien must show that his counsel's performance was so ineffective as to have impinged upon the fundamental fairness of the hearing process in violation of the Fifth Amendment's due process clause. To meet that standard, Pearce must demonstrate: (1) competent counsel would have acted differently; and (2) prejudice by his counsel's performance. See id.

The record clearly shows that Pearce's immigration counsel competently and zealously represented him. Counsel (a) submitted Pearce's initial application for a § 212(c) waiver, which "included an "impressive package of documents showing why [he] merited § 212(c) relief," Def. 8/14/2009 Post-H. Reply Mem. at 6, (b) updated that package in 2001, (c) timely appealed the IJ and BIA decisions, (d) appeared at all deportation proceedings, and (e) submitted substantive legal memoranda on Pearce's behalf, even when he stopped paying his legal bills. Quite significantly, moreover, at the conclusion of the direct agency appeal process, counsel never represented to Pearce that they would file a habeas brief on his behalf and then failed to do so, as occurred in cases relied upon by Pearce on this motion. See Perez, 330 F.3d. at 102 (counsel's failure to timely file § 212(c) application after stating he would was ineffective assistance of counsel, depriving defendant of judicial review); United States v. Najera-Trejo, No. 06-cr-98, 2006 WL 2191349, at * 6-7 (E.D.N.Y. July 31, 2006) (counsel's failure to file § 212(c) application after suggesting she would was below the performance level expected of competent counsel).

Boiled to their essence, Pearce's allegations of ineffective assistance reduce to a single contention – on December 31, 2003, Coven should have specifically informed him that he, on his

own and without hired counsel, could file a habeas petition. For this proposition, Pearce has cited no supporting precedent, nor is the Court aware of one. In fact, as the government points out, the Second Circuit's decision in United States v. Rodrigues, 289 Fed. Appx. 422, 2008 WL 2740843 (2d Cir. July 15, 2008), at least suggests otherwise. In Rodrigues, an alien was represented in deportation proceedings by counsel who then appealed the alien's deportation order to the BIA, which dismissed. But thereafter, as the result of a fee dispute, all contact between client and counsel ceased, no habeas review of the BIA's deportation order was pursued and the order was carried out 14 weeks after it was issued. The alien, in his ensuing prosecution for illegal reentry, sought to collaterally attack his deportation order by claiming, among other things, that counsel had failed to inform him about "the proper court in which to file a *pro se* request for [habeas] relief and the applicable deadline for requesting relief." The district court found that counsel had provided competent representation, and the Second Circuit affirmed.

Pearce attempts to distinguish Rodrigues by arguing that in the Rodrigues case it was the alien who severed the relationship with his attorney over a fee and, consequently, forfeited the opportunity to learn of alternatives, including self-representation, while Pearce's final consultation with his counsel, Coven, included no advice regarding alternate ways to challenge the BIA's decision without paying a fee. This is an argument that, in addition to splitting the finest of hairs, among other things, overlooks the fact that the IJ presiding over Pearce's initial deportation hearing took care to plainly and comprehensively explain to him that he had the option to proceed either with or without counsel, and even advised him of the availability of free or low-fee legal services, all of which Pearce confirmed that he understood. See supra at 2-3. In any event, even if Pearce did not recall that original advice or did not understand it to include pursuit of habeas relief in district court, there is not a shred of evidence that Pearce ever asked

Coven or any of his colleagues for an alternative to fee-paid service. He simply terminated the relationship instead. This is especially important given Coven's testimony that, under the law controlling such matters extant at the time, it would have been poor practice to suggest to Pearce without request that he could represent himself effectively in a habeas proceeding. Concisely put, there is no evidence in the record that Pearce ever advised Coven or anyone at his firm that, confronted with the fee requested, it was his intention to abandon his case. That failure by Pearce precluded any real discussion of alternatives, whether proceeding *pro se* or, as Coven testified, by way of a reduction of the firm's fee or referral to other counsel on a lower fee-for-service or pro bono basis. Even in the clear light of hindsight, Pearce had the benefit of competent and effective representation, until he terminated it by his own choice when he left his New Year's Eve meeting with Coven, never to contact the firm again. His argument fails utterly on this point.

Pearce's contention that he was deprived of judicial review by the errors of the IJ and BIA, on the other hand, poses a somewhat closer question. The Second Circuit has held that an IJ's affirmative misstatement that an alien is ineligible for § 212(c) relief as a matter of law can constitute deprivation of judicial review, even if the alien was able to and did not petition for a writ of habeas corpus. See Lopez, 445 F.3d at 96-100. The Lopez court reasoned that, even though the defendant could have sought judicial review within the 18-month period between the order and his deportation by filing a habeas petition, the defendant would have been discouraged from doing so by the erroneous information repeatedly provided to him by official sources. See id. at 98 (but for the misadvice, it might have occurred to the alien to look for other remedies; United States v. Clinton, No. 09-cr-262, 2009 WL 2905446, at *2-4 (S.D.N.Y. Sept. 3, 2009) (holding that "because his attorney, the IJ, and the BIA erroneously told Defendant that he could

14

not obtain section 212(c) relief, judicial review was not realistically available to him" notwithstanding technical availability of habeas review, and rejecting the government's rejoinder that defendant had "ample opportunity to discover the availability of habeas review and to file a habeas petition" during the almost six-year interval between the issuance of the deportation order and removal); Najera-Trejo, 2006 WL 2191349, at *5-6 (alien told by the IJ and BIA he was ineligible for § 212(c) relief); see also United States v. Bedros, Nos. 06-cr-249 & 07-cv-836, 2007 WL 2455135, at *4 (E.D.N.Y. Aug. 23, 2007).

Additionally, while this motion was *sub judice*, the Second Circuit decided Garcia-Padron v. Holder, 558 F.3d 196 (2d Cir. 2009). The government now concedes, in accord with Garcia-Padron, that the IJ erred as a matter of law by holding that Pearce was statutorily ineligible for a § 212(c) waiver due to his 2001 conviction and, obviously, that the BIA likewise erred in affirming the holding. Stated differently, the government cannot now challenge that the IJ's refusal to reach the merits of Pearce's § 212(c) application was fundamental error that would have supported the grant of a habeas writ.

Nevertheless, the existence of such error does not end the matter. As underscored by Rodrigues, such misinformation is not the automatic equivalent to a finding that an alien was denied a meaningful opportunity for judicial review. See 289 Fed. Appx. 422, 2008 WL 2740843. In addition to claiming ineffective assistance of counsel, Rodrigues unsuccessfully argued that he was denied an opportunity for judicial review at his removal proceedings because he was misinformed by the IJ and BIA that he was ineligible for relief under § 212(c). See id. at *1. Yet, while mindful of the close parallel between the instant case and Rodrigues, the Court is also not unmindful of the peculiarly unfortunate circumstances here. With years invested in deportation proceedings and one erroneous finding by the BIA that his § 212(c) application could

not be considered as a matter of law, the BIA finally revived and remanded that application only to have an IJ once again mistakenly refuse to reach the merits because of another erroneous determination of law. Moreover, the IJ issued a strongly-worded opinion flatly advising Pearce that there was absolutely no way he could avoid deportation by further resort to legal proceedings, which the BIA summarily affirmed. Against this backdrop of powerful but incorrect information, it is not inconceivable that Pearce might have believed the pursuit of further judicial review to be hopelessly futile. Accordingly, upon the totality of circumstances and by the slimmest of margins, the Court concludes that Pearce has met his burden of showing that "the deportation proceedings at which the [deportation] order was issued improperly denied [him] the opportunity for judicial review," 8 U.S.C. § 1326(d)(2), and now turns to consideration of whether "entry of the [deportation] order was fundamentally unfair." 8 U.S.C. § 1326(d)(3).

### 3. *Third Prong – Fundamental Unfairness*

To establish "fundamental unfairness" under § 1326(d)(3), an alien "must show both a fundamental procedural error and prejudice resulting from that error." Fernandez-Antonia, 278 F.3d at 159. The Second Circuit has clearly established that an IJ's erroneous advice regarding an alien's eligibility for § 212(c) relief "can, if prejudicial, be fundamentally unfair within the meaning of Section 1326(c)(3)." Copeland, 376 F.3d at 71. In this context, more pertinently, "prejudice is shown where there is a reasonable probability that, but for the IJ's unprofessional errors, the alien would have been granted Section 212(c) relief." Id. at 73. Reasonable probability, in turn, is defined as "a probability sufficient to undermine confidence in the outcome." United States v. Scott, 394 F.3d 111, 118 (2d Cir. 2005) (quoting Strickland v. Washington, 466 U.S. 668, 694 104 S. Ct. 2052, 2069 (1984)).

To determine whether such prejudice has been shown, the Second Circuit instructs a district court to hold a hearing like the hearing an IJ would have held before deciding a § 212(c) application on the merits, and then to balance the "adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented in his behalf to determine whether the granting of section 212(c) relief appears in the best interests of this country." Copeland, 376 F.3d at 73-74 (quoting In re Marin, 16 I. & N. Dec. 581, 584 (BIA 1978)). In performing this analysis, the court should "obtain all of the facts relevant to the particular alien and then apply standards established under Section 212(c) to those facts, taking into account actual cases in which similarly situated aliens have been granted or denied discretionary relief." Copeland, 376 F.3d at 74.[9]

In Scott, the Second Circuit reminded district courts that they must view the facts as they stood at the time that a § 212(c) merits hearing should have been held, and that "*ex post* data" should not be considered. 394 F.3d at 118-19 (stating that "in assessing whether the defendant-alien had a reasonable probability of not being deported at his proceeding . . ., the district court should reconstruct events as they existed at the time of the disputed deportation proceeding, without considering future occurrences"). An alien's "entire criminal record" at the time that he was ordered to be deported by an IJ is therefore relevant to a district court's evaluation of prejudice, but criminal convictions arising between the order and the actual deportation are not. Id. The district court must then "play the role of prognosticator, and divine whether, had the

---

[9] The Court notes that its task in considering whether there is a reasonable probability that a defendant would have been granted § 212(c) relief is made particularly difficult by the fact that a large percentage of "section 212(c) [decisions are] unpublished and inaccessible," thus making it almost impossible for a court reviewing cases years later to identify patterns in who was granted relief and who was denied relief. Copeland, 369 F. Supp. 2d 275, 305-08 (E.D.N.Y. 2005) (decision on remand). This difficulty is compounded by the fact that "[i]mmigration judges are human, subject to varying biases, and . . . it is inevitable that some judges would have approached their evaluations with more sympathy and compassion than others." Id. at 310. Nevertheless, what is known is that following a weighing of the above factors, "51.5% of the applications for which a final decision was reached between 1989 and 1995 were granted." St. Cyr, 533 U.S. at 296 n.5.

error not occurred, the defendant would likely have obtained immigration relief." Edwards v. INS, 393 F.3d 299, 311 (2d Cir. 2004). In the instant case, the parties are apparently in agreement that "[t]he latest possible relevant date for evidence that might bear on how an [IJ] might have ruled on Mr. Pearce's application for § 212(c) relief is August 8, 2002, the date of the IJ's erroneous ruling." Def. 6/12/2009 Ltr. at 1.

Substantively, critical to the Court's analysis is the BIA's 1978 delineation of both the adverse and positive factors that an IJ should weigh when considering a § 212(c) application. See Marin, 16 I. & N. Dec. at 584-85. Factors that were deemed adverse include the "nature and underlying circumstances of the exclusion ground at issue, the presence of additional significant violations of this country's immigration laws, the existence of a criminal record and, if so, its nature, recency, and seriousness, and the presence of other evidence indicative of a respondent's bad character or undesirability as a permanent resident of this country." Id. at 584. On the other side of the ledger, favorable considerations would include "family ties within this country, residence of long duration in this country, evidence of hardship to the alien and alien's family upon deportation, Armed Forces service, employment history, community service, property or business ties, evidence attesting to good character, and, in the case of one convicted of criminal conduct, proof of genuine rehabilitation." Lovell, 52 F.3d at 461 (summarizing Marin).

Here, in connection and intertwined with Pearce's motion to dismiss, this Court held a Copeland hearing on March 20, 2009 and April 23, 2009, to determine whether there is a reasonable probability that Pearce would have been granted § 212(c) relief had the § 212(c) factors now advanced been considered by the IJ when the IJ determined Pearce to be ineligible for such relief as a matter of law. On the first day of the hearing, Pearce called as witnesses his mother, Beryl DeSousa, his sisters, Rose and Donna Pearce, and his nieces, Zenova and Sashalee

King. On the second day, Pearce called his former attorney Jules Coven. The government did not call any witnesses, but submitted several documents received into evidence and relied upon its cross-examination of defendant's witnesses.

With respect to adverse factors, the Court first considers the exclusion ground originally identified by the immigration authorities – Pearce's 1994 conviction for selling cocaine. As the government correctly notes, IJs, even when they had authority to grant waiver in such circumstances, were particularly cautious about granting § 212(c) waivers to aliens convicted of drug-related offenses. See, e.g., Correa v. Thornburgh, 901 F.2d 1166, 1170 (2d Cir. 1995) (citing Marin and asserting that "[d]rug offenders must present a showing of unusual or outstanding countervailing equities to obtain a waiver, particularly if the grounds for exclusion involved trafficking in drugs"). It is also true, though, that courts in this circuit have found sufficient countervailing equities to establish prejudice in the cases of numerous drug offenders. See, e.g., Perez, 330 F.3d at 102 (affirming district court's finding that there was a reasonable probability that alien's significant family ties and history of steady employment in the United States would have outweighed his conviction for attempted sale of a controlled substance); Calderon, 391 F.3d at 376 (affirming holding by Judge Weinstein that the equities favoring an alien's application for § 212(c) relief, including his family ties and lengthy residence in the United States, most likely would have outweighed his conviction for possession of a controlled substance with intent to distribute). Moreover, the Court notes that shortly before Pearce's deportation proceedings commenced, the BIA clarified its position on this issue: "In sum, this Board has never implemented, in law or in fact, a strict policy of denying section 212(c) relief to every alien convicted of a serious drug offense without regard to the totality of circumstances presented in the case. Our established practice has been, and continues to be, to premise

discretionary determinations on the individual factors presented in a given case." In re Burbano, 20 I. & N. Dec. 872, 879 (BIA 1994).

It appears to the Court that the then-INS's stated basis for finding Pearce to be deportable – his nonviolent 1994 conviction for sale of cocaine – would likely not have been sufficient on its own to defeat an application for § 212(c) relief. Nor is this analysis materially affected by Pearce's simultaneous conviction for the lesser felony of attempted cocaine possession Historically, IJs have granted § 212(c) relief from time to time on the basis of countervailing equities even when an alien was convicted of multiple and/or violent offenses. See, e.g., In re Jose Jesus Gutierrez-Murillo, No. A13 717 602, 6 Immig. Rptr. (MB) B1-72 (BIA 1988) (granting § 212(c) waiver despite defendant's convictions for selling cocaine and for voluntary manslaughter); In re Gordon, 20 I. & N. Dec. 52, 53 (BIA 1989) (granting § 212(c) waiver despite defendant's lengthy criminal history including convictions for robbery and receiving stolen property); In re Coelho, 20 I. & N. Dec. 464, 468 (BIA 1992) (granting § 212(c) waiver despite defendant's multiple convictions for conspiracy to possess cocaine with intent to distribute and possession of cocaine with intent to distribute); cf. Scott, 394 F.3d at 119-121 (finding that defendant would have had a reasonable probability of obtaining § 212(c) waiver despite four convictions prior to his deportation hearings: two for criminal possession of stolen property, one for grand larceny and one for unauthorized use of a vehicle); Najera-Trejo, 2006 WL 2191349 at *9-10 (also finding that defendant had a reasonable probability of receiving § 212(c) relief despite his plea of guilty on eight different charges stemming from a violent carjacking, including one count of robbery in the first degree).

But an IJ reviewing Pearce's application in 2002 would also appropriately have considered his convictions for drug-related crimes in 1999 and 2001 – all after he had lost his

request for § 212(c) relief the first time and all while pending further appellate review. Granted both were for misdemeanor crimes, these convictions still demonstrate that Pearce not only continued to engage in criminal activity long after his deportation proceedings had begun, but also powerfully belie any notion that "during and after his time in prison, he was making real strides toward rehabilitation." Def. 7/6/2009 Post-H. Mem. at 5. In sum, while the post-1994 additions to Pearce's rap sheet should not have operated as a categorical bar to a § 212(c) waiver, if the IJ had considered them properly among other factors, they would certainly have seriously damaged Pearce's prospects of obtaining any discretionary relief.

As to evidence of other significant violations, the Court takes note of a document offered on the motion of the government which reflects that Pearce falsely represented himself to be a United States citizen in an application for a Georgia driver's license. Gvt. Post-H. Ex. 3. The document, dated June 22, 2002, was obviously in existence on August 8, 2002 and, in light of the fact that it subsequently made its way into Pearce's immigration file, it was presumably discoverable then with due diligence. Accordingly, the evidence could have been presented by the INS if the IJ had properly decided to reach the merits of Pearce's § 212(c) application in 2002. "Evidence is admissible in a deportation proceeding if it is probative and its use is fundamentally fair. Fairness in this context is 'closely related to the reliability and trustworthiness of the evidence.'" Montero v. INS, 124 F.3d 381, 385-86 (2d Cir. 1997); see Zhen Nan Lin v. U.S. Dept. of Justice, 459 F.3d 255, 268 (2d Cir 2006). A false statement by an alien regarding citizenship is clearly probative in the context of a § 212(c) application, and the document is reliable and trustworthy because it is a certified copy obtained directly from the Georgia Department of Driver's Services. See Gvt. 6/19/2009 Ltr.

Pearce, as would be expected, objects and has moved to strike this document on the ground that, since there is no evidence indicating that the INS "had any knowledge of this document on or before August 8, 2002," it is pure speculation that the INS would have found it in time for the IJ to consider it. Pearce's argument misses the equally obvious fact that the IJ was considering whether Pearce was ineligible as a matter of law for § 212(c) relief, so that the government had no reason to prepare any case on the facts whatsoever beyond proof of his convictions until that issue was determined. The question now in this back to the future re-creation of what might have been is to evaluate the evidence that could have been presented with respect to the factors relevant to a determination of a § 212(c) application on the merits. Since the document did exist and has been found, for purposes of this re-creation it is fair to conclude that once confronted with a merits hearing, the INS, with due diligence, could have discovered the document and offered it into evidence at the hearing, where it would have been properly received and considered by the IJ. Accordingly, the motion to strike is denied and the Court will consider Pearce's Georgia driver's license application for purposes of the Copeland hearing.

The Court now turns to the "social and humane factors" that weigh in favor of Pearce's § 212(c) application as of August 2002. Pearce entered the United States as a legal resident in 1988, and lived here until he was deported in 2005. As a result, he would have been a legal resident continuously for approximately 14 years. He had then, and continues to have now, significant extended family ties to this country – in 2002, many of his relatives were also living in the Bronx, including his mother, all of his seven siblings and several nieces and nephews.[10] 3/20/1999 Tr. at 65. At the hearing, family members provided heartfelt testimony attesting to

---

[10] The Court notes that in connection with his indictment for illegal reentry, Pearce executed an affidavit on March 14, 2008 in which he stated that he is married with a three-year-old dependent child. See CJA 23 Financial Affidavit, Dkt. No. 5. Because the record is devoid of any further mention of the existence and/or the whereabouts of his wife and child, the Court does not include them in its analysis other than to note the omission.

Pearce's good character. His sisters testified that he regularly babysat for their children and helped them balance their careers with their child care needs. In particular, when Donna Pearce's partner was murdered during a robbery in 1995 and she became a single mother of four young children, Pearce provided day-to-day emotional support, assuming the role of "a father figure" to his nieces. Id. at 65, 91. Pearce's mother testified that, following her heart attack in 1997, Pearce provided support – he transported her to and from doctors' appointments, picked up medication and generally made himself available whenever she needed help.

However, while there is evidence in the record regarding the role that Pearce played in his family in the 1990s, Pearce has not made any specific showing of hardship that his family would have suffered if he had been deported in 2002. His mother's medical treatment record, submitted as an exhibit to Pearce's updated I-191, for example, pertains solely to 1998, see Def. Ex. S, and there is no testimony or evidence that she was still physically incapacitated and reliant on Pearce in 2002. And there is no indication that Pearce ever supported his family financially– to the contrary, he turned to his mother to pay his legal bills during deportation proceedings. 3/20/1999 Tr. at 15-16.

Further, the Court cannot find that Pearce was steadily and/or gainfully employed in 2002. Viewed charitably, Pearce's employment history is erratic and poorly documented. According to the original I-191 counsel filed on his behalf in May 1996 and the updated I-191 counsel filed in December 2001, Pearce was employed constantly from 1993 through 2001, except for the period of his incarceration. His employers are identified as East Coast Fire Prevention (eight months, 11/1993 – 7/1994), R&V Electricians (five months, 6/1995 – 11/1995), Billy's Midway (four and a half years, 3/1996 – 9/2000), and Dan's Auto (15 months, 9/2000 – 12/2001). See Def. Ex. I, Q. Yet, from testimony at the hearing, it is apparent that

Pearce's job as a ride operator at Billy's Midway (a carnival company) was only on a seasonal basis, not continuous. See 3/20/1999 Tr. at 24. Moreover, while the papers filed in support of Pearce's 1996 I-191 included a letter from Billy's Midway attesting to his employment at that time, see Def. Ex. J, the 2002 I-191 contains no similar documentation from Dan's Auto.

In any event, Pearce never declared income on tax returns for any of the jobs listed on his I-191 forms – indeed, he seemingly filed no tax returns at all before 2001, when his immigration counsel advised him to do so. See Def. Ex. S, Def. Post-H. Ex. E. Apparently in response to that advice, Pearce finally did file returns for 1997 through 2001, on which he identified himself to the IRS as a self-employed general contractor (as opposed to the employee described in his I-191s) and stated that he earned no more than $8358 in income for any one of those years. See Def. Ex. S. In such circumstances, Pearce's employment history is simply "not sufficient to merit consideration" as a positive factor supporting his § 212(c) application. See Copeland, 2005 WL 1109441, at *61 (citing Arango-Aradondo v. INS, 13 F.3d 610, 613 (2d Cir. 1994) (noting alien's sporadic employment record and questionable tax compliance); Vlassis v. INS, 963 F.3d 547, 550 (2d Cir. 1992) (deeming employment record suspect where no written record existed and alien claimed to have been paid "off the books.")).

Finally, the Court notes that by all accounts Pearce has never performed community service, served in the Armed Forces or developed any discernable property or business ties to the United States. Thus, no other countervailing factors are submitted for the Court's consideration.

Based on the totality of the evidence presented at or incorporated into the record of the Copeland hearing, this Court finds that there is no reasonable possibility that Pearce would have been granted relief under § 212(c) by an IJ considering his § 212(c) waiver request on its merits in 2002. The positive but unremarkable factors supporting Pearce's § 212(c) application–

namely, (a) his many years of residency in the United States, (b) the presence here of his mother, siblings and other members of his obviously loving and close-knit extended family, but for whom, given his spotty employment record, Pearce provided no financial support (nor is there a demonstration that his family would have suffered beyond the hardships typically endured by any family facing deportation of a loved one) – would not have outweighed his chronic violations of drug laws and sustained involvement in criminal activity, however petty. After spending time in jail and facing the real threat of deportation, Pearce was obviously nonetheless unwilling or unable to rehabilitate himself, and even provided false information to a government agency about his citizenship status. Given these facts, an IJ would have found it not only difficult to determine but highly unlikely that the granting of § 212(c) relief to Pearce in 2002 would serve "the best interests of this country." Accordingly, Pearce has not demonstrated that he was prejudiced by the procedural errors in his deportation proceedings, and fails at the third prong.

## CONCLUSION

The Court having found that defendant Rohan Mark Pearce has failed to establish that the entry of the deportation order against him was fundamentally unfair, the order must be sustained on collateral attack pursuant to 8 U.S.C. § 1326(d). As a consequence, defendant's motion to dismiss the indictment must be, and hereby is, denied.

SO ORDERED.

DATED:      Brooklyn, New York
            November 30, 2009

                                    ERIC N. VITALIANO
                                    United States District Judge

25